# DECISIONS

OF THE

# Court of Appeals of Kentucky

## WINTER TERM, 1915.

### Bates v. Commonwealth

(Decided March 26, 1915.)

Appeal from Fayette Circuit Court.

1. Forgery—Signature by Fictitious Person.—A fictitious person can-not sign or authorize a signature to an instrument, and one in possession of an instrument purporting to have been signed by one shown to have been a fictitious person is presumably in possession of a forged instrument.

2. Forgery—Evidence.—Evidence that there is no such person as the one whose name is signed to an instrument at a place 20 or more miles from where his residence is said to be, is insufficient to show that there is no such person at the designated place or its vicinity.

3. Forgery—What Must Be Shown to Establish.—In a prosecution for the uttering of a forged instrument two things must be shown, (1) that the instrument was forged, and (2) that it was uttered or attempted to be passed with the knowledge that it was forged.

4. Criminal Law—Admissions—What Does Not Amount to Confes-sion.—The admission by an accused of the truth of independent and isolated facts which may tend to prove his guilt do not amount to a confession, and will not authorize the giving of an instruction under Section 240 of the Criminal Code, providing that a confession out of court will not warrant conviction unless ac-companied by other proof that the offense was committed.

5. Criminal Law—Confession.—A confession outside of court in criminal law is a voluntary statement made by the accused to another person wherein he acknowledges himself guilty of the offense charged, and discloses the circumstances of the act or his participation therein.

S. B. DISHMAN, JR., for appellant.

JAMES GARNETT, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Reversing.

Appellant was indicted in the Fayette Circuit Court charged with uttering a forged check, and upon his trial was found guilty and sentenced to imprisonment for not less than eight nor more than nine years, and he has appealed.

The evidence for the Commonwealth showed that on Saturday night, the 12th of September, 1914, he went into the store of W. A. Green on Short street in Lexington, and was looking at, with the view of purchasing, a brass bed which was being exhibited in a show window; that he priced it, and told Green that he did not have the money but he would go down the street and find his partner named Haskell who owed him some money; that he came back and brought a check, purporting to have been signed by H. L. Haskell, for $68.50, and asked if Green would cash it; he stated that he and Haskell were partners in a dairy business near Winchester on the Mount Sterling turnpike, and that he wanted the bed for his wife. Green told him that he did not have the money to cash the check, but, on pretext of seeing if he could get the money elsewhere, he left the store with the check and called up the police authorities. Appellant indorsed the check in the store in the presence of Green, and after Green's return to the store a policeman in uniform came in, and thereafter appellant stated to Green that he would not worry him about the check but would make a deposit of $5.00 on the purchase price of the bed, and would be back in town in two or three days to see further about it and arrange for its transportation. He did make the deposit of $5.00 and received a receipt therefor. When he started out of the store the policeman stopped him and asked to be permitted to see the check, which was shown to him by appellant, whereupon he requested appellant to go with him to the police headquarters, where he was further questioned and finally committed to jail.

It further appears that about the same time appellant, while negotiating with another firm in Lexington for the purchase of some wire fencing, had this check in his possession, but did not ask that it be cashed; on the contrary said he would go to the bank and have it cashed and come back and pay for the fencing.

It was further shown by officers of the bank upon which the check was drawn that they knew no such man

as H. L. Haskell, and that he did not have and had never had an account at that bank, and that no such man was known to them; and it was likewise shown by testimony of a detective that no such man as H. L. Haskell was known around Lexington.

It is shown by three or four witnesses that, after the evidence was heard in the examining court, appellant, upon being asked by the court if he had anything to say, got up and made a statement, but the exact nature of that statement is not clear under the evidence. One witness said that he made the statement that it was a forged check, and he thought that was the best way out of it, but later in his testimony the same witness stated that he stuck out to the very last that a man by the name of Haskell, living between Winchester and Mount Sterling, had given him the check.

Another witness, who was present at the police court trial, says that appellant stated that he had come there to the races and got broke, and wanted to raise some money, but at no time stated that the check was forged.

Another witness says that he stated that he had been playing the races, was in tough luck, and tried to put the check through, but he did not say, in terms, that the check was forged, and never stated that Haskell did not give him the check.

The witness Green, who was present at the police court trial, says that appellant in his statement there said he had got in the wrong town to do that kind of business and admitted that the check was not good, but never said it was a forged check.

Another witness stated that he only said that he had gotten into the wrong place.

This was the whole of the testimony in chief for the Commonwealth, and the defendant asked the court for a peremptory instruction to find him not guilty, which the court declined to give.

The appellant testified for himself that he was a resident of the State of Washington; that he had come to Lexington a few days before the Fall race meeting for the purpose of attending the races, and that a few weeks before he had left his home in Washington he had a letter from his brother who was then living near Winchester at some point between Winchester and Mount Sterling; that a day or two after reaching Lexington he went from there up into Clark County, between Win-

chester and Mount Sterling, seeking his brother, and was informed there that his brother some three or four weeks previously had left there with his family and gone to Arkansas; that while in search of his brother he met a stranger, who gave his name as H. L. Haskell, and Haskell, upon being informed by appellant that Timothy Bates (appellant's brother) was a brother of his, informed him that he owed Timothy $68.50 for some Kino pigeons he had gotten from him, and, upon appellant's promise to see that the money was paid to his brother, gave him the check for $68.50, telling him at the time to hold it for a few days, that being the 8th of September; that he had never seen Haskell before that day and had never seen him since; that Haskell told him he lived between Winchester and Mount Sterling on a pike the name of which he had forgotten, and was engaged with another man in the creamery business. He further testified that he had been confined in jail at all times since his arrest, but had written two letters addressed to Haskell, one to Mt. Sterling, and one to Winchester, but had received no answer to either of them.

Neither party introduced any evidence to show whether there was or not, in the vicinity indicated, such a man as H. L. Haskell, although the prosecuting witness Green testified on his main examination that appellant said he and Haskell were partners in the dairy business near Winchester on the Mount Sterling turnpike.

Manifestly, if there was such a man in that vicinity and he actually signed the check, appellant was not guilty; while on the other hand, if there was no such man there and the name was purely fictitious, the fact that appellant was in possession of a check purporting to have been signed by such fictitious person would furnish strong presumptive evidence that the check was forged.

The court will take judicial knowledge of the fact that the point indicated as the residence of Haskell is twenty or more miles from the City of Lexington, and the evidence presented by the Commonwealth to the effect that no such person had and had never had an account at the bank upon which the check was drawn, and that no such man was known in or around Lexington, is not conclusive, or even convincing, that no such man lived at the point indicated twenty or more miles away.

Two questions are presented for decision; (1) Was there sufficient evidence that the check attempted to be

passed by appellant was a forged instrument? and (2) Was appellant entitled to an instruction under the provisions of Section 240 of the Criminal Code?

It is conceded that there is no direct evidence that the check was forged; but it is argued that the circumstances shown in evidence justified the submission of that question to the jury. The contention is that the unreasonable story told by appellant, taken in connection with the fact that he registered at a hotel in Lexington under an assumed name; that he was seeking to buy in Lexington a bed for his wife who was in another state; that he was betting on the races and had come to Lexington for that purpose; and the improbability of his story that this man, whom he had never seen before or since, had given him a check payable to himself for a debt which the stranger claimed to have owed his brother, authorized the submission of the case to the jury.

It may be conceded that these facts and circumstances place appellant in an unenviable light, and inevitably make him an object of suspicion. But do they separately, or when taken as a whole, furnish sufficient evidence that the check was forged?

Because one tells an unreasonable story of how he came into possession of a written instrument is not conclusive evidence that it was forged; because one registers at a hotel under an assumed name is not evidence that an instrument which he subsequently came into possession of is forged; because one offers to buy a bed when he, under the circumstances, seems to have had no use for the same is not evidence that the check, which he offered in payment for the same, is forged. Admitting the force of these suspicious circumstances it does not make them evidence that the check was forged; but if they had been coupled with evidence either that there was such a man as Haskell and he had not signed the instrument, or even with evidence that there was no such man as Haskell at the place or in the vicinity where appellant claimed Haskell lived, it would have justified the submission of the case to the jury.

One in possession of an instrument purporting to have been signed by one who is shown to have been a fictitious person is presumably in possession of a forged instrument, for it is impossible for a fictitious person to sign or authorize a signature to anything. But is evi-

dence that there is no such person as the one whose name is signed to the instrument at a place twenty or more miles from where his residence is said to be, sufficient to show that there is no such person at the designated place or its vicinity?

The evidence that no such man as Haskell lived in or near Lexington does not prove, or even conduce to prove, that no such man lived twenty or more miles away, between Mt. Sterling and Winchester.

One cannot be guilty of uttering a forged instrument unless the instrument was forged. Unreasonable as appellant's story seems to be it may yet be true, and suspicious as these circumstances appear they, in the absence of evidence that no such man as Haskell lived at the designated point, do not furnish sufficient evidence that the instrument was forged to authorize the case to go to the jury.

In a prosecution for uttering a forged instrument two essential things are necessary to be shown: (1) That the instrument was forged; and (2) That it was uttered or attempted to be passed with the knowledge that it was forged. Commonwealth v. Burgess, 91 S. W., 266.

In this case there was a failure to show that the instrument was forged just as there was a failure to show in the case referred to that the instrument was uttered or attempted to be passed.

Because of the failure of the Commonwealth to show that there was no such person as Haskell in the vicinity where he was said to be by appellant the motion for a peremptory instruction should have prevailed.

The statements of appellant at the examining trial did not amount to a confession; only one witness said that he stated that the check was forged, and that witness later in his testimony stated that appellant "stuck out to the very last that some gentleman between Winchester and Mount Sterling·had given it to him, by the name of Haskell." These two statements taken together do not amount to a confession, or to even an admission that the check was forged. None of the other witnesses introduced gave any statement of appellant which could be treated as a confession or an admission that the check was forged. Taking their statements altogether they amount to nothing more than an admission by appellant that the check was not good, which, of course, is not equivalent to a confession or admission that it was a forgery.

These statements of appellant were admissible in evidence against him because they tended to illuminate the whole transaction, but they do not amount to a confession. The distinction between a confession by an accused, and the admission by him of the truth of independent or isolated facts which may tend to prove his guilt, was clearly pointed out by this court in the case of Spicer v. Commonwealth, 21 Rep., 528.

The trial court in that case treated certain statements of the defendant as a confession and gave an instruction under Section 240 of the Criminal Code, which provides that a confession out of court will not warrant a conviction unless accompanied by other proof that the offense was committed.

This court said this was in effect saying to the jury by the trial court that defendants had confessed when in fact they had not, and was reversible error.

This court in that case, defining a confession, said:

"A confession in criminal law is a voluntary statement made by a person charged with the commission of a crime or misdemeanor communicated to another person, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act, or the share and participation which he had in it." (Black's Law Dictionary.)

"There is no testimony in the record that either of the appellants ever made a confession or acknowledgment of their guilt of the offense charged. On the contrary, they most emphatically deny their guilt, and testify, both on the examining and in the final trial, to facts which conduce to show their innocence. We, therefore, think that this instruction was misleading to the jury and highly prejudicial to appellants."

In this case, as in that, there was no evidence of a confession; here the defendant consistently adhered to his statement that a man giving his name as H. L. Haskell and claiming to live between Winchester and Mount Sterling had given him the check.

In the absence of a confession of guilt as distinguished from admissions of independent facts, the court properly declined to instruct under Section 240.

The judgment is reversed with directions to grant appellant a new trial, and for further proceedings consistent herewith.

Whole Court sitting. Judges Settle, Carroll and Hannah dissenting.

DISSENTING OPINION BY JUDGE CARROLL.

Ordinarily I would not write a dissenting opinion in this character of case, but I am so well satisfied that the judgment ought not to be reversed upon the ground stated in the opinion that I have thought it worth while to set down the reasons for my dissent.

At his examining trial on the charge of forging the check, and in open court, the appellant made the following admissions as testified to by witnesses who were present

J. C. Stewart was asked and said: "Q. I will ask you if you were present at the police station on the day he was tried there? A. Yes, sir. Q. I will ask you whether or not, in response to any questions, he then made a statement with reference to this check? A. Yes, sir. Q. What statement did he make? A. He said it was a forged check. After the Commonwealth's testimony was produced, he got up and admitted that it was a forged check. Q. Did he testify, or not, in the case? A. No, sir. He got up and plead guilty after the testimony was all in. He got up and plead guilty and said it was a forged check. Q. Who did he say that to? A. To the court. Q. How did he happen to say it? A. After they testified, they asked him if he had anything to say, and he just got up and made the statement that it was a forged check. That he thought that was the best way out of it. He denied it at first and Judge Riley asked him if he had anything to say and he said, 'No, sir,' that it was a forged check. Q. He said it was a forged check? A. Yes, sir. Q. And before that he said it was not a forged check? A. He stuck out to the very last that some gentleman, between Winchester and Mt. Sterling had given it to him, by the name of Haskell."

P. T. Clark, another witness, who was present at the examining trial, was asked and said: "Q. I will ask you if you heard him make any statement after the evidence was heard in that case? A. My recollection of it is that Mr. Kemper or Judge Riley asked him what he was doing here and he said he come to the races, and they asked him about the check, and asked him if he had any money in the bank, and he said no; he was here to the rac s and got broke and wanted to raise some money. Q. Did he say he had drawn the check himself? A. He did not. Q. Just said he wanted to raise some money? A. Yes, sir. Q.

Was that after he had testified in the case? A. I think so? I don't think he testified very much; don't think he said very much. Q. I mean after the case was tried? A. Yes, sir; he was on the witness stand when he said it. Q. Did he at any time say it was a forged check? A. He did not.''

Malcom Brown, another witness who was present at this trial, was asked and said: "Q. Did you hear this man make any statement about a check? A. Yes, sir. Q. What was it? A. He said he had been playing the races and got in tough luck here and tried to put the check over. Q. Said what? A. Tried to pass the check. Q. Did he say it was a good check or a bad check? A. Didn't say anything about that; said he tried to put it over. Q. He didn't say at that time there was any money in the bank, did he? A. No, sir. Q. He did not say Mr. Haskell had not signed the check, did he? A. No, he did not say that. Q. Didn't say it was a forged check? A. Not in those words. Q. What do you mean by 'not in those words?' A. He said he tried to put it over. That was what I taken him to mean, that he tried to put it over. Q. Did he use these words? A. Yes, sir; said he was in hard luck, had been here playing the races and tried to put the check over. Didn't say whether Mr. Haskell had signed it or not, or whether there was any money in the bank. Q. Did he say he tried to get it cashed or put it over? A. Tried to put it over, is the way, if I remember correctly. Q. He didn't in any of that conversation say Mr. Haskell did not give him the check? A. No, sir.''

W. A. Green, another witness who was present at the examining trial, was asked and said: "Q. What statement did he make? A. He said he just got in the wrong town to do that kind of business, but said the check was not good; said it right there before Mr. Stewart and four or five of us. Q. Do you remember the exact language used? A. No sir, I do not.'' On his cross-examination he was asked and said: "Q. He didn't say Mr. Haskell did not sign the check? A. He said it was a bad check; that the check was not good. Q. What did he say? A. There was four or five of us talking. He said the check was not good. He said, 'I just got in the wrong town for this business.' Q. He did not say it was a forged check? A. He did not say it was a forged check, no. Q. He did not say it was a forged check? A. He said the check was no good.''

Dudley Veal, another witness present at the examining trial was asked and said: "Q. Did you hear a statement immediately after the trial was over in reference to this check? A. Yes, sir; after the testimony was in for the Commonwealth the Judge asked him if he had anything to say, and he said, no, he had nothing to say; that he just got into the wrong place. Q. Do you remember anything else he said? A. No. Q. That is the way you remember it? A. Yes, sir." On cross-examination the witness was asked and said: "Q. And that is what was said? A. That is my recollection."

The appellant, testifying in his own behalf, was asked and said: "Q. I will ask you in regard to a statement made in the police court in regard to the forgery of this check. Did you make that statement, or words to that effect? A. I did not. Q. What statement did you make? A. After two or three gentlemen had testified, Judge Riley asked me what I had to say, but I said to Judge Riley these very words; I says: 'I guess it is a case of betting on the wrong horse.' Q. What do you mean by that? A. I got tangled up on a bad check not knowing anything about the circumstances, not knowing anything about that man. Q. Did you have any reason to believe at that time that Mr. Haskell was giving you a cold check? A. I had not."

On his cross-examination he was asked and said: "Q. Now you said when you were down to the police station and you were tried there that you made a statement to the Judge about betting on the wrong horse? A. I did not. I said this: 'I guess that I am on the wrong horse, Judge.' That was the only statement I made in the police court. Q. And did you not make the statement that you got into the wrong place to do this kind of business? A. No, sir. Q. And that you tried to put this check over and could not do it? A. No, sir; never to any man. Q. Didn't you really say that you had been betting on the wrong horse and that you were all down and out and that was the reason you tried to put this matter over? A. I did not. I made no such statement at all. Q. You are sure about that? A. Yes, sir."

This is all the evidence in the record relating to what appellant said in open court on his examining trial, and I confidently submit that this evidence was more than sufficient to sustain the verdict and the judgment. Four witnesses in behalf of the Commonwealth gave evidence

that appellant either directly admitted that he forged the check or used other expressions admitting his guilt, and this evidence is not denied by any person except the appellant.

Section 240 of the Criminal Code provides that "A confession of a defendant, unless made in open court, will not warrant a conviction, unless accompanied with other proof that such an offense was committed." But this section of the code does not affect the confession made by appellant, because it was made in open court, and when a confession of guilt is made in open court in direct and positive words, or in words that reasonably amount to a confession of guilt, the evidence of one witness for the Commonwealth is sufficient to take the case to the jury.

It is said in the opinion that the declarations made by the appellant in the police court did not amount to a confession of his guilt or to an admission that the check was forged; but in this conclusion I am unable to agree. I think each of the witnesses for the Commonwealth gave evidence sufficient to show that the appellant either directly confessed his guilt or admitted it in words that amounted to a confession. With this evidence before them, the jury could not reasonably have concluded otherwise than that appellant was guilty of the commission of the crime with which he was charged.

If a conviction cannot be sustained on this character of evidence, then many judgments of conviction that have been affirmed by this court should have been reversed. Heretofore we have consistently adhered to the rule that when there was sufficient evidence to justify the submission of the case to the jury, its finding of guilt would not be disturbed although it might be against the weight of the evidence. In this case I submit that no claim could be made that the finding of the jury if it was rested alone upon the evidence of what took place in the examining trial was not supported by the evidence, because four disinterested witnesses testified to what the appellant said, and there is no contradiction of their evidence except by the appellant himself. Under these circumstances, it seems to me that the opinion in this case lays down a new rule concerning the weight and sufficiency of evidence in criminal cases, and one that if adhered to cannot but result in the discharge of many persons found guilty of committing crimes and who ought to be punished.

But if there had been left out of this record every-thing that transpired in the examining court, and it should be assumed that no examining trial was ever held, there is, in my opinion, sufficient evidence in the record to sustain the verdict and judgment. I do not mean to say that, leaving out what took place in the examining court, there was sufficient evidence furnished by the witnesses for the Commonwealth to make out a case against the appellant; but he took the witness stand in his own behalf, and the facts and circumstances that were developed on his examination, taken in connection with the evidence for the Commonwealth, show, as I think, beyond a reasonable doubt his guilt. When the appellant voluntarily took the witness stand in his own behalf, the jury had the right to consider and weigh against him every incriminating statement that he made.

The defendant in a criminal prosecution who takes the witness stand in his own behalf, may give evidence that will alone warrant his conviction. His testimony may also be used in connection with that of the witnesses for the Commonwealth to supply deficiencies in the case made out by the witnesses for the Commonwealth, and that is what the evidence of the appellant did in this case. It supplied the missing links in the evidence for the Commonwealth. His guilt is written in unmistakable terms in almost every page of his evidence. His story on the witness stand bears every ear-mark of falsehood and fraud, and is so full of contradictions and improbable statements as to leave no room to doubt his guilt.

But before relating what the appellant said on the witness stand in testifying in his own behalf, let me re-cite briefly the substance of the evidence for the Com-monwealth independent of the confessions.

C. P. Wiggins, who was engaged in the fence business in Lexington, testified that appellant came into his store with a check drawn on the Bank of Commerce, of Lex-ington, payable to Frank M. Bates, purporting to be signed by H. L. Haskell, and wanted to buy some fenc-ing, to be shipped to him on the Monday following. That he did not ask to have the check cashed but said he would go out and get the money on it and when he got the money would come back and pay for the fence. He did not, however, return.

On Saturday, September 12, 1914, appellant went into the store of W. A. Green to buy a bed, telling Green that

he wanted it for his wife and would have it shipped to Winchester. He also told Green that he did not have any money but was going down the street to see his partner, Haskell, who owed him some money. When he came back he brought the check and wanted Green to cash it and take out pay for the bed and give him the balance. He told Green that Haskell and he were partners in the dairy business at Winchester and that he was in Lexington on some business and happened to see the bed in the window and wanted to buy it. The suspicion of Green was aroused, and he called up the police station, and a policeman was in the store when appellant came back with the check. When appellant saw the policeman, he took the check out of Green's hand and told him he would make a deposit of $5 on the bed and send his wagon for it on Tuesday. At this point the policeman arrested appellant and took him away.

When appellant took the witness stand in his own behalf, his evidence, in disconnected but narrative form, is as follows: He said that his home was in the State of Washington, and that he came to Lexington for the purpose of attending the races then going on. That he got the check from one, H. L. Haskell, a man whom he did not know, but who said he lived between Winchester and Mt. Sterling. That he met him for the first time between Winchester and Mt. Sterling, as he, appellant, was on his way to Winchester to locate his brother, who had written him that he was at that point. That he had not been able to locate his brother, but on this trip to Winchester he met Haskell and asked him if he knew a man named Tim Bates. That in reply Haskell told him that Tim Bates and his wife and children had left for Arkansas about three weeks before. Appellant said that Haskell asked him if he knew Bates, and he said he was his brother, and Haskell then said: "I would like to locate him. I owe him $68.50 for pigeons." That appellant then said to him: "If you want to give it to me I will see that he gets it," and that Haskell then wrote the check and gave it to him. That he had never seen or heard of Haskell before. That while in Lexington he stopped at the Phoenix Hotel and registered under the name of Thomas J. Wade, from San Francisco. He said that Haskell gave him the check on the 8th of September but asked him to hold it for a few days, and that he did not try to get it cashed until Saturday, the 12th.

He further said that he had some goods stored in Indianapolis. That his wife and children were at Louisville and he had telephoned them to go to Cincinnati. That he had intended to go there to meet them but missed the train, and while walking around the city happened to see this bed in Green's window. That it was a fine bed and he wanted to buy it to ship it home. He denied the acts and statements attributed to him by Wiggins and Green, and said that he never tried to buy any wire from Wiggins and was not in his store.

The substance of this evidence is that appellant, after making a trade with Wiggins to buy some fencing wire, went to the store of Green, where he bought a bed, and in payment for the bed, which he said he would send his wagon for on the following Monday and take it to Winchester, asked Green to cash a check, take out the price of the bed, and give him the remainder in money. That the bank on which this check was drawn had no account with any man named Haskell and did not know any person of that name. That appellant lived in the State of Washington, but registered at the hotel under the name of Wade, from San Francisco, and testified that he got this check from a man he had never seen or heard of before, who said he knew appellant's brother and owed him for pigeons, and gave appellant the check in order that he might pay appellant's brother. That he was going to ship the bed to Cincinnati, Ohio, where he expected to meet his family, who had gone from Indianapolis, Indiana, to Louisville, Kentucky, and then to Cincinnati.

Other circumstances pointing to his guilt are: The fact that he tried to cash this check on Saturday night after banking hours, and when the policeman who had come to Green's store in response to a message from Green, appeared, appellant was anxious to get his check back and said nothing more about having it cashed.

This evidence of appellant's guilt, although circumstantial, is, I think, entirely sufficient to show that the check was a forgery and that appellant knew it, and on this evidence alone, without reference to what transpired in the police court, the conviction of appellant should be sustained.

Judges Settle and Hannah join me in this dissent.